No. 24-60653

# In the United States Court of Appeals for the Fifth Circuit

STARBUCKS CORPORATION,

*Petitioner/Cross-Respondent,*

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent/Cross-Petitioner.*

*On appeal from a decision of the National Labor Relations Board,
No. 14-CA-300065*

## BRIEF OF PETITIONER/CROSS-RESPONDENT STARBUCKS CORPORATION

JEFFREY S. HILLER
LITTLER MENDELSON, P.C.
  41 S. High St., Ste. 3250
  Columbus, OH 43215

JONATHAN O. LEVINE
LITTLER MENDELSON, P.C.
  1111 E. Kilbourn Ave., Ste. 1000
  Milwaukee, WI 53202

LISA S. BLATT
  *Counsel of Record*
AMY MASON SAHARIA
CLAIRE R. CAHILL
ERIC J. TUCKER
WILLIAMS & CONNOLLY LLP
  680 Maine Avenue, S.W.
  Washington, DC 20024
  (202) 434-5000
  lblatt@wc.com

*Counsel for Petitioner/Cross-Respondent*

# CERTIFICATE OF INTERESTED PERSONS
## Case No. 24-60653

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

**Petitioner/Cross-Respondent:**

- Starbucks Corporation

**Respondent/Cross-Petitioner:**

- National Labor Relations Board

**Counsel for Petitioner/Cross-Respondent:**

- Lisa S. Blatt
  Amy Mason Saharia
  Claire R. Cahill
  Eric J. Tucker
  Williams & Connolly LLP
  680 Maine Avenue, S.W.
  Washington, DC 20024
  (202) 434-5000
  lblatt@wc.com
  asaharia@wc.com
  ccahill@wc.com
  etucker@wc.com
- Jeffrey S. Hiller
  Littler Mendelson, P.C.
  41 S. High St., Ste. 3250
  Columbus, OH 43215

i

(614) 463-4230

jhiller@littler.com

- Jonathan O. Levine

  Littler Mendelson, P.C.

  1111 E. Kilbourn Ave., Ste. 1000

  Milwaukee, WI 53202

  (414) 291-5537

  jlevine@littler.com

**Counsel for Respondent/Cross-Petitioner:**

- Ruth E. Burdick

  Gregory Paul Lauro

  Kira Dellinger Vol

  National Labor Relations Board

  1015 Half Street, SE

  Washington, DC 20570

  (202) 273-2960

  appellatecourt@nlrb.gov

  Greg.lauro@nlrb.gov

  kira.vol@nlrb.gov

- M. Kathleen McKinney

  National Labor Relations Board

  600 S. Maestri Pl.

  New Orleans, LA 70130

  (504) 589-6361

Counsel further certifies that Starbucks Corporation has no parent company and that no public company owns 10% or more of its shares.

/s/ *Lisa S. Blatt*

LISA S. BLATT

*Attorney of Record for*

*Petitioner/Cross-Respondent*

## STATEMENT REGARDING ORAL ARGUMENT

Petitioner Starbucks Corporation requests oral argument pursuant to Fifth Circuit Rule 28.2.3.  This case presents significant questions about whether the National Labor Relations Board's order violates the First Amendment and the National Labor Relations Act and lacks substantial evidence.  Oral argument will assist the Court in resolving these important issues.

# TABLE OF CONTENTS

Page

JURISDICTIONAL STATEMENT ................................................................1

STATEMENT OF THE ISSUES ..................................................................1

INTRODUCTION ........................................................................................2

STATEMENT OF THE CASE .....................................................................5

    A.    Factual Background ........................................................................5

    B.    Administrative Proceedings...........................................................14

SUMMARY OF ARGUMENT.....................................................................18

STANDARD OF REVIEW ..........................................................................20

ARGUMENT ...............................................................................................22

I.     STARBUCKS DID NOT THREATEN REPRISAL............................22

    A.    Neri Did Not Threaten Reprisal in the PDC Meetings ...............23

    B.    Jacobs' and Neri's Comments About the Hiring Portal and
         Store Hours Did Not Threaten Reprisal .......................................35

II.    STARBUCKS DID NOT CREATE AN UNLAWFUL
     IMPRESSION OF SURVEILLANCE..................................................43

CONCLUSION.............................................................................................54

# TABLE OF AUTHORITIES

Page

## CASES

*Am. Meat Inst. v. USDA*, 760 F.3d 18 (D.C. Cir. 2014) (en banc) ..................33

*Apple Inc. v. NLRB*, --- F.4th ---, 2025 WL 1862823 (5th Cir. 2025).....1, 21, 36

*Belcher Towing Co. v. NLRB*, 726 F.2d 705 (11th Cir. 1984).....................44, 45

*Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485 (1984)................21

*Brown & Root, Inc. v. NLRB*, 333 F.3d 628 (5th Cir. 2003) ...................*passim*

*Carey Salt Co. v. NLRB*, 736 F.3d 405 (5th Cir. 2013)................................21, 36

*Chamber of Com. v. Brown*, 554 U.S. 60 (2008)...........................................2, 52

*Charter Commc'ns, Inc. v. NLRB*, 939 F.3d 798 (6th Cir. 2019) ...............50, 51

*Charter Commc'ns, LLC*, 366 NLRB No. 46, slip op. (Mar. 27, 2018) ...........46

*Crown Cork & Seal Co. v. NLRB*,
    36 F.3d 1130 (D.C. Cir. 1994)........................................................24, 33, 52, 53

*Delchamps, Inc. v. NLRB*, 585 F.2d 91 (5th Cir. 1978).....................................47

*Dish Network Corp. v. NLRB*, 953 F.3d 370 (5th Cir. 2020) ......................21, 22

*Dow Chem. Co., Tex. Div. v. NLRB*, 660 F.2d 637 (5th Cir. 1981)..........*passim*

*Dresser-Rand Co. v. NLRB*, 838 F.3d 512 (5th Cir. 2016)................................20

*DTR Indus., Inc. v. NLRB*, 39 F.3d 106 (6th Cir. 1994) ...................................31

*Exxon Rsch. & Eng'g Co. v. NLRB*, 89 F.3d 228 (5th Cir. 1996) ...............33, 34

*FDRLST Media, LLC v. NLRB*, 35 F.4th 108 (3d Cir. 2022) .................*passim*

*Federal-Mogul Corp. v. NLRB*, 566 F.2d 1245 (5th Cir. 1978) .................27, 30

*Flexsteel Indus., Inc.*, 311 NLRB 257 (1993) ..............................................29, 30

*Greater Omaha Packing Co. v. NLRB*,
    790 F.3d 816 (8th Cir. 2015).....................................................................45, 46

*Grove v. NLRB*, 140 F.4th 506 (D.C. Cir. 2025) ...............................................14

*Hendrickson USA, LLC v. NLRB*, 932 F.3d 465 (6th Cir. 2019)............*passim*

*In-N-Out Burger, Inc. v. NLRB*, 894 F.3d 707 (5th Cir. 2018) ........................22

*Intertape Polymer Corp. v. NLRB*,
    801 F.3d 224 (4th Cir. 2015)..........................................................44, 45, 50, 51

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ...........................20, 31

*Macy's, Inc. v. NLRB*, 824 F.3d 557 (5th Cir. 2016)............................................1

*Nat'l Ass'n of Mfrs. v. NLRB*, 717 F.3d 947 (D.C. Cir. 2013)...........................33

*NLRB v. AllService Plumbing & Maint., Inc.*,
    138 F.4th 889 (5th Cir. 2025) ...............................................................21, 36, 39

*NLRB v. Bogart Sportswear Mfg. Co.*,
    485 F.2d 1203 (5th Cir. 1973)........................................................25, 28, 32

Page

Cases—continued:

*NLRB v. Borden Co.*, 392 F.2d 412 (5th Cir. 1968).......................................47, 48
*NLRB v. Centeno Super Markets, Inc.*, 555 F.2d 442 (5th Cir. 1977).......41, 42
*NLRB v. Computed Time Corp.*, 587 F.2d 790 (5th Cir. 1979) .................45, 48
*NLRB v. Dadco Fashions, Inc.*, 632 F.2d 493 (5th Cir. 1980).........................47
*NLRB v. Gen. Tel. Directory Co.*, 602 F.2d 912 (9th Cir. 1979)................29, 30
*NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969) .....................................*passim*
*NLRB v. Int'l Bhd. of Elec. Workers, Loc. 340*, 481 U.S. 573 (1987) ...............54
*NLRB v. Mueller Brass Co.*, 509 F.2d 704 (5th Cir. 1975) ..........................44, 46
*NLRB v. Pentre Elec., Inc.*, 998 F.2d 363 (6th Cir. 1993)...........................25, 31
*NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393 (1983)........................................31
*NLRB v. USA Polymer Corp.*, 272 F.3d 289 (2001) .........................................47
*NLRB v. Windemuller Elec., Inc.*, 34 F.3d 384 (6th Cir. 1994) .................40, 43
*Plastronics, Inc.*, 233 NLRB 155 (1977) ................................................34, 35
*Promedica Health Systems, Inc.*, 343 NLRB 1351 (2004) ...............................53
*Renew Home Health v. NLRB*, 95 F.4th 231 (5th Cir. 2024) .....................40, 41
*S. Bakeries, LLC v. NLRB*, 871 F.3d 811 (8th Cir. 2017) ................................32
*Selkirk Metalbestos, N. Am., Eljer Mfg., Inc. v. NLRB*,
   116 F.3d 782 (5th Cir. 1997)..............................................................23
*Snyder v. Phelps*, 562 U.S. 443 (2011) ..........................................................21
*Starbucks Corp. v. NLRB*, 140 F.4th 971 (8th Cir. 2025).........................*passim*
*Stern Produce Co. v. NLRB*, 97 F.4th 1 (D.C. Cir. 2024) ...........................53, 54
*TRW-United Greenfield Div. v. NLRB*, 637 F.2d 410 (5th Cir. 1981) ......34, 35
*UAW v. NLRB*, 834 F.2d 816 (9th Cir. 1987) .....................................................25
*UNF W., Inc. v. NLRB*, 844 F.3d 451 (5th Cir. 2016) ....................24, 25, 28, 34
*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951)..................................36
*Venture Indus., Inc.*, 330 NLRB 1133 (2000)....................................................30
*Webco Industries, Inc.*, 327 NLRB 172 (1998)....................................................34

## CONSTITUTION AND STATUTES

U.S. Const. amend. I...............................................................................*passim*
29 U.S.C.
   § 158................................................................................................*passim*
   § 160.....................................................................................1, 21, 36

Page

# OTHER AUTHORITIES

Black's Law Dictionary (12th ed. 2024)
    *Lay on the Table* ........................................................................28
    *Threat* ......................................................................................24
Jacob Martin, *Starbucks Employees Announce Plans to Unionize Two*
    *Kansas City-Area Locations*, KCUR (Jan. 31, 2022),
    https://tinyurl.com/3ww8mcvn ...............................................7, 51
*On the table*, Merriam-Webster Online Dictionary ...........................28
Howard Schultz, *Statement Before the Senate Committee on Health,*
    *Education, Labor, and Pensions* 2 (Mar. 29, 2023),
    https://tinyurl.com/ydh7phk7 .....................................................5
Starbucks, *Starbucks Raises the Bar with Industry-Leading*
    *Employee Benefits, Outperforming Competitors* (Nov. 6, 2023),
    https://tinyurl.com/43m6v2r2 ......................................................5
Starbucks Workers United, *Updates from Bargaining!* (Apr. 2024),
    https://tinyurl.com/3n7c4pme ....................................................28
Mary Yang, *Starbucks Union Organizing Gave Labor a Jolt of Energy*
    *in 2022*, NPR (Dec. 9, 2022), https://tinyurl.com/m6mwkew8 ......7

## JURISDICTIONAL STATEMENT

The National Labor Relations Board (NLRB or Board) issued its Decision and Order on December 16, 2024. Starbucks petitioned for this Court's review on December 24, 2024. The Board applied for enforcement on January 24, 2025. This Court has jurisdiction because the Decision and Order is a final order, and venue is proper in this Circuit because Starbucks transacts business within this Circuit. *See* 29 U.S.C. §§ 160(e), (f); *Macy's, Inc. v. NLRB*, 824 F.3d 557, 561 n.1 (5th Cir. 2016). The petitions and cross-application are timely because the National Labor Relations Act (NLRA) imposes no time limit for such filings. *Apple Inc. v. NLRB*, --- F.4th ---, 2025 WL 1862823, at *3 (5th Cir. 2025).

## STATEMENT OF THE ISSUES

1.      Whether the Board erred in holding that Starbucks threatened reprisal by accurately describing the give-and-take nature of collective bargaining during routine meetings with employees and by answering an employee's questions about Starbucks' hiring portal and store hours.

2.      Whether the Board erred in holding that Starbucks created an unlawful impression of surveillance by briefly discussing unionization during routine meetings with employees.

## INTRODUCTION

Union campaigns must allow for "uninhibited, robust, and wide-open debate" between employers and employees about the benefits and drawbacks of unionizing. *Chamber of Com. v. Brown*, 554 U.S. 60, 68 (2008). The First Amendment protects employers' and employees' right to discuss unionization with each other. Congress deemed that protection so important that it enshrined it in Section 8(c) of the NLRA. 29 U.S.C. § 158(c).

But recently, the Board has weaponized the NLRA to punish employers for having honest discussions with employees about unionization—here, true statements that collective bargaining changes the status quo. The Board's over-policing of employer-employee conversations stifles the very speech the NLRA is supposed to protect. If employers cannot talk about unionization without fearing that the Board will warp their words into unfair labor practices, then they will not discuss unionization at all. That result would deprive employers and employees alike of authentic, mutually beneficial conversations about unionization.

This case is another example of the Board's proclivity to punish employers for constitutionally protected conversations with employees about the collective bargaining process. In 2022, Starbucks store manager Carmella

Neri held regularly scheduled, biannual check-ins with her employees (whom Starbucks calls "partners"). These meetings were brief (10-20 minutes), took place in the store's lobby, and covered topics ranging from partners' performance to current Starbucks benefits. Neri praised her partners in the meetings, even asking one partner if she was interested in becoming a shift supervisor.

Neri also touched briefly on new union activities in the area. She explained to one partner that current Starbucks benefits "could not be guaranteed" during collective bargaining, and told another partner that benefits "would be put on the table" during the negotiation process. Neri never told partners that their benefits would decrease, let alone that *Starbucks* would slash benefits to punish union supporters. And zero evidence suggests that any partners left these meetings feeling coerced or threatened. Quite the opposite: at least one partner started displaying a union pin on her Starbucks uniform after her meeting.

Despite this non-coercive context, the Board held (in significant part over a dissent from then-Member Kaplan) that these conversations contained "coercive threats" and, incredibly, that they left partners with the "impression they were being surveilled" in violation of Section 8(a)(1) of the NLRA. The

Board similarly concluded that Starbucks committed unfair labor practices when a manager and assistant store manager made a single passing remark to one partner about the store's hiring practices and hours during the union campaign.

The Board's decision smothers Starbucks' constitutionally and statutorily protected speech. The First Amendment and NLRA Section 8(c) empower employers to communicate their views about unionization and to make "prediction[s] as to the precise effects [they] believe[] unionization will have." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618 (1969). "[E]mployers' right of free expression of opinion and fact" has long been protected. *Brown & Root, Inc. v. NLRB*, 333 F.3d 628, 635 (5th Cir. 2003). *Only* speech that threatens "reprisal" violates the NLRA. 29 U.S.C. § 158(c). "The First Amendment would permit no less." *Dow Chem. Co., Tex. Div. v. NLRB*, 660 F.2d 637, 644 (5th Cir. 1981).

Starbucks never threatened its partners with reprisal for participating in protected union activities. Nor did Starbucks suggest it was surreptitiously surveilling its partners' union activities. The Board's contrary conclusions trample on Starbucks' rights under the NLRA and the First Amendment. The Court should deny enforcement.

4

## STATEMENT OF THE CASE

### A.    Factual Background

1.    Starbucks is America's largest coffee purveyor.  In the United States, Starbucks employs some 235,000 people, whom Starbucks calls "partners" because each has an ownership stake in the business.  Starbucks, *Starbucks Raises the Bar with Industry-Leading Employee Benefits, Outperforming Competitors* (Nov. 6, 2023), https://tinyurl.com/43m6v2r2.  Starbucks promotes many baristas to management and pays up to 100% of their college tuition.  Howard Schultz, *Statement Before the Senate Committee on Health, Education, Labor, and Pensions* 2 (Mar. 29, 2023), https://tinyurl.com/ydh7phk7.  Starbucks also offers "industry-leading benefits," from comprehensive health care and stock ownership to student loan assistance, paid sick leave, and backup childcare.  *Id.*

Starbucks respects its partners' right to organize under the NLRA.  The NLRA in turn protects both employers' and unions' First Amendment right to "express[] … any views, argument, or opinion" in any form, which "shall not constitute or be evidence of an unfair labor practice … if such expression contains no threat of reprisal or force or promise of benefit."  29 U.S.C. § 158(c).  For this reason, employers like Starbucks can "communicate …

general views about unionism or any … specific views about a particular union." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618 (1969); *see also Dow Chem. Co., Tex. Div. v. NLRB*, 660 F.2d 637, 644 (5th Cir. 1981). An employer can even freely predict "the precise effects [the employer] believes unionization will have" on the company. *Gissel*, 395 U.S. at 618. So long as the speech does not involve "a threat of retaliation based on misrepresentation and coercion," it is protected. *Id.*

2.    This case is about routine employer speech between Starbucks managers and partners. The three partners at issue here—Arden Ingram, Maia Cuellar-Serafini, and Ramon "Robert" Fonseca—worked at Starbucks' North Amidon Avenue store in Wichita, Kansas (the Amidon store) in 2022. Record Excerpts (RE) 5. Each was relatively new to the store. Ingram joined Starbucks in September 2021, Cuellar-Serafini in November 2021, and Fonseca started at the store in late April 2022. ROA.22; ROA.31; ROA.45; RE6.

In February 2022, some store partners started talking about potentially unionizing. ROA.32; RE5. In the ALJ hearing, Cuellar-Serafini testified that some of these initial conversations took place outside the store. ROA.32. Ingram, by contrast, noted that she "would sit out there with [her] co-workers"

6

when she discussed unionization.  ROA.24.  Fonseca never explained where he discussed unionizing—in his own words, he had a "pretty passive role" in the process.  ROA.46-47.

During this time, Starbucks was engaged in open dialogue with its partners about the unionization process across the country, including in nearby Kansas City.  *See* RE2; RE6-7; *see also*, *e.g.*, Jacob Martin, *Starbucks Employees Announce Plans to Unionize Two Kansas City-Area Locations*, KCUR (Jan. 31, 2022), https://tinyurl.com/3ww8mcvn (unionization announcements in two Kansas City stores).  There was a "surge in union activity" in spring 2022 in Starbucks stores, "other restaurant chains," and even "non-food industries."  Mary Yang, *Starbucks Union Organizing Gave Labor a Jolt of Energy in 2022*, NPR (Dec. 9, 2022), https://tinyurl.com/m6mwkew8.  Those activities "peak[ed]" at Starbucks in March 2022.  *See id.*

While these conversations were taking place, Carmella Neri managed Starbucks' Amidon store.  RE5.  Knowing that her partners might have questions about recent unionization efforts, Neri printed a packet of union-related information, put it on her desk, and offered to answer questions. ROA.77-78.  Some partners (but not Ingram, Cuellar-Serafini, or Fonseca)

said they did not want to discuss unions. ROA.78. Neri respected this sentiment, simply reminding partners that they "could always come to [her] and ask questions." ROA.78.

3. Neri used the one-on-one Performance Development Conversations (PDC meetings) she had scheduled for spring 2022 to provide partners with information about unionization, "in case they had any questions about what was going on in Kansas City." ROA.77-78; RE5-6. Neri regularly held PDC meetings every six months, in the spring and fall. ROA.33; ROA.47; ROA.74; RE5. These one-on-one meetings covered partners' performance, career development interests, and Starbucks' benefits. ROA.24; ROA.33-35; ROA.47; ROA.76; ROA.78; RE5. They took place in the store's lobby. ROA.25; ROA.34; ROA.47; RE5. For her partners' convenience, Neri listed the PDC meetings on their calendars and scheduled the meetings for days partners would be working. ROA.25; ROA.34; ROA.74-75; RE5. Partners were paid for attending. RE5.

In April 2022, Neri held standard PDC meetings with Ingram, Cuellar-Serafini, and Fonseca. As always, these meetings were brief—around 10-20 minutes. ROA.26; ROA.36; ROA.52; RE5-6. Neri discussed the partners' performance and opportunities for growth, and she summarized the benefits

that Starbucks offered.   ROA.26; ROA.28; ROA.48-51; ROA.76-77.   Ingram

remembered Neri praising her performance "on the e[s]presso machines and

the cold bar."    ROA.26.    Cuellar-Serafini similarly recounted Neri

complimenting her work ethic and asking if she was interested in becoming a

shift supervisor.   ROA.34-35.   Fonseca recalled discussing de-escalation

procedures.  ROA.51-52.

Neri also briefly spoke with these partners about unionization and how

collective bargaining could affect the store.

*PDC Statements to Ingram.*   According to Ingram, Neri said that

unionization "affects everyone at the store," including people for and against

unionizing.  ROA.26.  That is the beginning and end of Neri's and Ingram's

discussion about collective bargaining.  Neri did not say that she knew about

union activities at the Amidon store.  Nor did she tell Ingram that she was

monitoring Ingram or any other partner.  For her part, Ingram did not ask

any follow-up questions; say she was uncomfortable discussing unions,

benefits, or any other topic; or leave the PDC meeting.  ROA.26; ROA.28.

*PDC Statements to Cuellar-Serafini.* Cuellar-Serafini's and Neri's PDC

discussion about collective bargaining was similarly short.  Neri generally

commented that "she was aware that there w[ere] discussions about union

organizing at the store" because "there was talk going around." ROA.35. Neri did not tell Cuellar-Serafini that she was monitoring any partner, inside or outside the store. ROA.35.

Neri also showed Cuellar-Serafini a document listing Starbucks benefits, including maternity leave benefits.[1] ROA.35. Neri discussed all these benefits—as was standard during PDC meetings. ROA.35-36. Then, Neri said: "If you were interested in unionizing, these benefits could not be guaranteed to you." ROA.36. Cuellar-Serafini also testified that Neri "pulled" the list away from her. ROA.35-36.

Neri did not "say anything else about unions or unionizing." ROA.36. She never said that any partner, let alone a union supporter, would lose benefits or otherwise be punished for voting in favor of the union. To the contrary, Cuellar-Serafini recalled times where Neri encouraged her and other partners to do their own research and make whatever decision that partner thought was best. ROA.40-41. Cuellar-Serafini, like Ingram, did not ask any follow-up questions, say she was uncomfortable discussing unions or other topics, or leave the meeting. ROA.36-38.

---

[1] Cuellar-Serafini was pregnant in April 2022. ROA.35-36.

*PDC Statements to Fonseca.*  Fonseca also recalled Neri showing him "a list of all of the benefits" available to Starbucks partners.  ROA.48; ROA.253-260.  After discussing these benefits, Neri noted that "if we were to unionize, then our benefits would be put on the table, and potentially we could lose some of them or, you know, who knows what the change would be if we were to unionize."  ROA.51.  Neri also commented that she was generally aware of "some unionization efforts going around in the district."  ROA.51.  She otherwise did not discuss unions.  She did not say that she had been monitoring Fonseca or any other partner.  ROA.51.  Fonseca did not ask any follow-up questions, say he was uncomfortable discussing unions or other topics, or leave.  ROA.51; ROA.59.

Neri did not specifically recall at the ALJ hearing whether she discussed the link between benefits and unionization at the April 2022 PDC meetings, but she agreed that "[i]f [she] said anything, it would have been that everything [i]s up for negotiation if a store decides to unionize."  ROA.86.  She never said that partners would lose benefits.  ROA.86.

4.    After the PDC meetings, in May 2022, Service Employees International Union Local 513 filed a petition seeking recognition as the official union representing the Amidon store partners.  ROA.263-264; RE5.

11

Some partners, including Cuellar-Serafini, started wearing union pins, as Starbucks allows. ROA.33; RE5.

5.      According to Fonseca, sometime after the union filed its petition, two Starbucks customers told him they could not find the Amidon store's hiring portal—the website people use to apply for jobs. ROA.52-54. Fonseca looked for the portal himself and could not find it either. ROA.54. He alerted Lauren Jacobs, the store's assistant manager, who—according to Fonseca— responded that Starbucks could not discuss ongoing union activities with prospective employees, and management "didn't feel comfortable hiring new people without talking to them about the Union." ROA.54-55.

Neri did not remember the store's hiring portal being closed during the union campaign, although she acknowledged that Starbucks' hiring portal had crashed before because of technical issues. ROA.84. Either way, she explained, the store was actively interviewing and hiring during spring and summer 2022; it did not change its hiring practices after the union petition was filed. ROA.83-84.

The store could not afford to suspend hiring. It was so understaffed in summer 2022 that Neri had to keep closing early. *See* ROA.55; ROA.63. As Fonseca testified, "there were a significant number of Partners" who were not

showing up to work around this time. ROA.63. These call-outs were not union-related; partners were missing work because "they were sick, or some incident happened." ROA.63-64.

Because of the staffing shortages, the Amidon store had no choice but to roll back its hours. ROA.79-80. When Fonseca started at the store, its hours were 4:30AM-9:00PM (16.5 hours) Mondays through Fridays, and 4:30AM-10:00PM on weekends (17.5 hours). ROA.56. But in July 2022, the hours changed to 4:30AM-8:30PM (16 hours), seven days a week. ROA.56. No Starbucks store can be open without at least two people working—one shift supervisor and one barista. ROA.80. And partners' shifts cannot be longer than eight hours. ROA.80. By keeping the store open for only 16 hours per day, Neri had to schedule only "two supervisors for the whole day, one in the morning and one at night, and then Baristas also." *See* ROA.80.

Fonseca testified that he asked Neri in the store lobby why the hours were changed, and she told him it was "to relieve some of the pressure that the Union had on the people." ROA.56-57. Fonseca responded, "Okay." ROA.57. That was their entire conversation. *See* ROA.56-57.

6.     The Amidon store held a mail ballot election in July 2022. ROA.265-268; RE5.  The union lost the election and did not file any objections. ROA.270; RE5.

### B.     Administrative Proceedings

1.     A few weeks after losing the election, the union filed charges against Starbucks with the NLRB.  ROA.95-101.  In December 2022, the NLRB's regional director issued a complaint, launching administrative proceedings.  ROA.102-111.

After a one-day virtual hearing, NLRB ALJ Michael A. Rosas issued a decision concluding, as relevant here, that the April 2022 PDC meetings, Jacobs' alleged comment about the hiring portal, and Neri's alleged comment about store hours violated Section 8(a)(1) of the NLRA.[2]  The ALJ recognized that "the Board has long held that employers have the right to discuss unions during meetings that take place in the workplace and when employees are being paid."  RE7 (citations omitted).  But the ALJ nonetheless concluded that

---

[2] The D.C. Circuit recently commented that ALJ Rosas committed a "gross evidentiary blunder" where his factual findings were "not supported by any evidence"; his legal theory was "irrational"; and his conclusions were "arbitrary, capricious, and senseless" and "amount[ed] to [a] faintly ridiculous proposition."  *Grove v. NLRB*, 140 F.4th 506, 513 (D.C. Cir. 2025).

during the PDC meetings Neri "violated Section 8(a)(1) by threatening employees with the loss of benefits if they selected the Union as their bargaining representative." RE8. The ALJ reasoned that Neri's reference to benefits was a prediction and that employer speech predicting "changes in working conditions or benefits must be 'carefully phrased on the basis of objective fact' to represent the give-and-take nature of future collective bargaining, rather than suggesting that by entertaining union representation, employers are courting" the employer's disapproval. RE7-8 (quoting *Gissel*, 395 U.S. at 618). The ALJ also assigned Starbucks—not the General Counsel—the burden of proving that Neri's PDC statements "were based on fact and not threats." RE8.

Under that standard, the ALJ concluded that Neri unlawfully threatened Cuellar-Serafini and Fonseca with the loss of existing benefits. According to the ALJ, Neri's remark to Cuellar-Serafini that she "could not be guaranteed maternity benefits if employees unionized" "implicitly threatened that Cuellar-Serafini stood only to lose crucial benefits" because Neri did not "mention that Cuellar-Serafini's benefits could also go up." RE8. The ALJ likewise concluded that Neri's statement to Fonseca that partners' benefits "would be put on the table, and potentially some could be lost" was

implicitly threatening because "Neri failed to explain the give-and-take nature of collective bargaining." RE8.

The ALJ further concluded that Starbucks violated Section 8(a)(1) when (1) "Jacobs told Fonseca that the hiring portal was closed due to her reluctance to hire amid a union campaign," and (2) Neri told him that the store's hours had been reduced "due to the union activity of the store's employees." RE8. The ALJ deemed it "irrelevant" whether the hiring portal was actually closed or whether the store hours were actually reduced because of union activity. RE8. Instead, the ALJ held that these statements violated Section 8(a)(1) because they "unlawfully link[ed]" the hiring portal and store hours to union activity and thus were threats. RE8.

The ALJ also concluded that Neri's meetings with Ingram, Cuellar-Serafini, and Fonseca violated Section 8(a)(1) because she "created the impression that [their] union activities [we]re under surveillance." RE7. According to the ALJ, Neri's comments about unionization created an illegal impression of surveillance because they were a "new development" in PDC meetings. RE7. Bootstrapping off his conclusions that Neri had unlawfully threatened reprisal, the ALJ explained that Neri violated the NLRA when she

"transition[ed] from ordinary and customary [PDC] subjects to union activity and the potential impact on [partners'] existing employee benefits."  RE7.

3.     A divided Board affirmed.  RE1-4.  Like the ALJ, the Board concluded that (1) Neri threatened Cuellar-Serafini and Fonseca with the loss of benefits if they engaged in protected union activities, and (2) Jacobs' and Neri's statements to Fonseca about the hiring portal and reduced hours were also unlawful threats.  RE2-3.  Two Board members also agreed with the ALJ that Neri's comments during the PDC meetings created an impression of surveillance.  RE2-3.

Then-Member (now-Chairman) Kaplan dissented in significant part, concluding that Neri's PDC statements did not create an unlawful impression of surveillance because Neri's statements simply showed "a general awareness of organizing activities rather than knowledge of the employees' respective union activities."  RE2.  In Member Kaplan's view, nothing Neri said suggested that she knew what Ingram, Cuellar-Serafini, or Fonseca were doing; at most, the record reflected that Neri knew about union-related activities in nearby Kansas City, and some of those activities had percolated to the Amidon store.  Member Kaplan also pointed out that the majority had

ignored record evidence suggesting that there was open union activity inside the store.  RE2.

## SUMMARY OF ARGUMENT

I.    The First Amendment and NLRA Section 8(c) protect Neri's and Jacobs' statements about unionization because they "contain[ed] no threat of reprisal or force or promise of benefit."  29 U.S.C. § 158(c).

A.    Neri never threatened *reprisal* during the April 2022 PDC meetings.  She simply explained—in an unremarkable, non-coercive context— that current benefits would be "put on the table" and "could not be guaranteed."   In other words, Neri accurately described how collective bargaining works.  This Court, its sister circuits, and the Board have held that substantially similar statements are protected speech, not unlawful threats.

In concluding otherwise, the Board applied the wrong legal standard.  Rather than require the General Counsel to prove that Neri's speech was unlawful, the Board placed the burden on Starbucks to prove that Neri's statements were based on objective facts.  But Starbucks bears no burden here.  Rather, the General Counsel must prove that Starbucks' speech violates Section 8(a)(1) and is not protected under Section 8(c).  It failed to carry that burden.  Moreover, Neri's statements are not the kind of predictions about the

effects of unionization that require support through additional objective facts. She did not predict anything; she merely described the bargaining process, accurately explaining that bargaining does not "guarantee" a particular result for benefits.

B.     Neither Jacobs nor Neri unlawfully threatened reprisal by (allegedly) saying they closed the store's hiring portal and reduced the store's hours because of the union.  As an initial matter, it is improbable those remarks occurred.  The ALJ—whose reasoning the Board adopted without elaboration—improperly resolved every single credibility dispute in the General Counsel's favor, ignoring a mountain of record evidence that contradicted his credibility determinations, including unrebutted evidence that the store was hiring new employees during this period.  But even accepting that the remarks occurred, the ALJ did not explain how those comments would have coercively threatened partners.  If anything, the hours change *improved* partners' situation, as the store was understaffed at the time.

II.     Neri's generic comments about unionization "talk" came nowhere close to suggesting that Starbucks was unlawfully surveilling partners.  The Board failed to recognize that only objectively *coercive* speech can create an

impression of surveillance that violates Section 8(a)(1), as several circuits have recently held. Neri's statements—both in isolation and in context—are not coercive. Her speech at most suggested that she was generally aware that unidentified partners were discussing unionization—an unremarkable fact in a small store where managers work side by side on the floor with partners— not that Starbucks was spying on union activities.

Concluding otherwise, the Board observed that (1) the unionization conversations took place outside the store, (2) Neri had not previously discussed unionization in the PDC meetings, and (3) Neri did not say how she knew of the unionization efforts. These observations were wrong, irrelevant, or both. Unionization conversations happened inside the store, Neri had not previously discussed unionization because these were the first PDC meetings after the union campaign began, and it is immaterial that Neri did not say how she learned of the unionization efforts. The Board strayed far from its task of ascertaining coercion.

## STANDARD OF REVIEW

This Court reviews the Board's legal conclusions *de novo*. *Dresser-Rand Co. v. NLRB*, 838 F.3d 512, 516 (5th Cir. 2016); *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 403-05 (2024). Whether the First Amendment

protects particular speech is a legal question that requires this Court to "conduct[] an independent review of the record both to be sure that the speech in question actually falls within the unprotected category and to confine the perimeters of any unprotected category within acceptably narrow limits." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 505 (1984); *accord Snyder v. Phelps*, 562 U.S. 443, 453 (2011).

The Court reviews the Board's factual findings for substantial evidence, based on "the record considered as a whole." *Carey Salt Co. v. NLRB*, 736 F.3d 405, 409-10 (5th Cir. 2013) (quoting 29 U.S.C. § 160(e)); *see also Apple Inc. v. NLRB*, --- F.4th ---, 2025 WL 1862823, at *3 (5th Cir. 2025).

Substantial-evidence review is not a rubber stamp. "Because the Court is not left merely to accept the Board's conclusions, the Court must be able to conscientiously conclude that the evidence supporting the Board's determination is substantial." *Brown & Root, Inc. v. NLRB*, 333 F.3d 628, 633 (5th Cir. 2003) (citation omitted). That means the Court can "uphold the Board's factual findings only if they are supported by evidence that is substantial when viewed in light of the record as a whole, including 'whatever in the record fairly detracts from its weight.'" *NLRB v. AllService Plumbing & Maint., Inc.*, 138 F.4th 889, 900 (5th Cir. 2025) (quoting *Dish Network Corp.*

*v. NLRB*, 953 F.3d 370, 376 (5th Cir. 2020)). And the Court "must reject an order of the Board when it fails to grapple with countervailing portions of the record." *Id.* at 900-01 (cleaned up); *see also Dish Network*, 953 F.3d at 376 ("[A] flawed reading of the record provides no substantial evidence for a finding." (citation omitted)). These same standards apply where the Board affirms the ALJ's findings and conclusions. *In-N-Out Burger, Inc. v. NLRB*, 894 F.3d 707, 714 (5th Cir. 2018).

## ARGUMENT

## I. STARBUCKS DID NOT THREATEN REPRISAL

Fifty-six years ago, the Supreme Court recognized an employer's free speech right "to communicate to his employees any of his general views about unionism" and "any of his specific views about a particular union," and to "make a prediction as to the precise effects he believes unionization will have on his company." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618 (1969). This Court too has affirmed that "[u]nder Section 8(c) an employer is free to communicate to employees a statement of opinion about the union as well as to predict the effect of unionization on the workplace." *Brown & Root, Inc. v. NLRB*, 333 F.3d 628, 633 (5th Cir. 2003).

22

NLRA Section 8(c) codifies Congress' commitment to "the continued existence of employers' First Amendment rights, which must be balanced against the protection afforded by Section 8(a)(1) to employees' right to engage in union activity." *Id.* at 634. The provision "manifests a congressional intent to encourage free debate on issues dividing labor and management." *Selkirk Metalbestos, N. Am., Eljer Mfg., Inc. v. NLRB*, 116 F.3d 782, 788 (5th Cir. 1997) (citation omitted). Under Section 8(c), "[t]he expressing of any views, argument, or opinion … shall not constitute or be evidence of an unfair labor practice under any of the provisions of this [Act], if such expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c).

The at-issue statements, considered in their full context, are not unlawful threats of reprisal. The Board and ALJ reached the opposite conclusion by unlawfully inverting the burden of proof and failing to consider the statements in their full context. The Court should deny enforcement.

## A.    Neri Did Not Threaten Reprisal in the PDC Meetings

Neri spoke truthfully and lawfully when she said in the April 2022 PDC meetings that "benefits could not be guaranteed," ROA.36 (to Cuellar-Serafini), and that "benefits would be put on the table," ROA.51 (to Fonseca),

23

if the store unionized.  These straightforward statements accurately explained that collective bargaining can change the status quo.  No reasonable employee would have perceived Neri as threatening that Starbucks would punish partners who supported unionizing by unilaterally gutting their benefits.  In concluding otherwise, the Board improperly placed the burden on Starbucks to show that Section 8(c) protected Neri's statements, rather than requiring the General Counsel to prove that Neri's words were unlawful under Section 8(a)(1).

1.    Only employer speech that contains a "threat of reprisal or force or promise of benefit" violates the NLRA.  29 U.S.C. § 158(c).  A threat is "[a] communicated intent to inflict harm or loss on another."  *Threat*, Black's Law Dictionary (12th ed. 2024).  It conveys that an employer will "deliberately inflict[]" reprisals—*i.e.*, "return evil for evil."  *Crown Cork & Seal Co. v. NLRB*, 36 F.3d 1130, 1138 (D.C. Cir. 1994) (cleaned up).

Under this standard, speech that "reasonably implie[s] that the employer could *unilaterally*" harm employees is an unlawful threat of reprisal because it implies that the employer will retaliate against union supporters. *UNF W., Inc. v. NLRB*, 844 F.3d 451, 458 (5th Cir. 2016).  A supervisor's statement, for instance, that "of course, if the Union wins, *the Company* could

reduce your wages" threatens unilateral reprisal. *Id.* (emphasis added). So might a prediction that a plant "*would* close if the union succeeded," depending on context. *NLRB v. Bogart Sportswear Mfg. Co.*, 485 F.2d 1203, 1205 (5th Cir. 1973) (emphasis added). Without words explaining that changes to pay, benefits, or working conditions could result from the bargaining process or circumstances outside the employers' control, these one-sided statements risk leaving union-supporting employees with the impression that their employers will retaliate against them. *See UNF W.*, 844 F.3d at 458.

At the same time, the NLRA "protects employers' right of free expression of opinion and fact." *Brown & Root*, 333 F.3d at 635. Employers may "warn[] employees about the natural give and take of the bargaining process." *Hendrickson USA, LLC v. NLRB*, 932 F.3d 465, 472 (6th Cir. 2019). And they can generally comment on "the uncertainty of give-and-take collective bargaining." *UAW v. NLRB*, 834 F.2d 816, 822 (9th Cir. 1987).

Courts therefore "must construe [Section 8(a)(1)] narrowly when applied to pure speech." *FDRLST Media, LLC v. NLRB*, 35 F.4th 108, 126 (3d Cir. 2022). Courts must be careful not to confuse "lawful advocacy" with "threats of retaliation." *NLRB v. Pentre Elec., Inc.*, 998 F.2d 363, 369 (6th Cir. 1993). They cannot pluck "bits and pieces of statements … out of context,"

ignore "the facts and circumstances in which the statements were made and which were known to the employee," and look at the employer's words "in vacuo." *Dow Chem. Co., Tex. Div. v. NLRB*, 660 F.2d 637, 644 (5th Cir. 1981); *accord Starbucks Corp. v. NLRB*, 140 F.4th 971, 975 (8th Cir. 2025) ("[T]he employer's alleged threat … is not viewed in a vacuum.").

For these reasons, an employer's speech is an unlawful threat only "if the totality of the circumstances reveals an employee reasonably could conclude the employer is threatening economic reprisals if the employee supports the union." *Brown & Root*, 333 F.3d at 634. When evaluating the totality of the circumstances, courts consider the conversation's full context, including the words themselves, their timing, how and when they were delivered, by whom, and in what workplace conditions. *Id.* at 634-36; *accord FDRLST*, 35 F.4th at 125-26; *Hendrickson*, 932 F.3d at 476-77.

Courts must also "weigh[] employees' subjective impressions to determine how a reasonable employee would objectively view her employer's conduct." *Starbucks*, 140 F.4th at 976; *see also FDRLST*, 35 F.4th at 124. Because an "employee's subjective impressions" of a supervisor's allegedly threatening speech are not "immaterial," the ALJ and Board commit legal error where they "disclaim[] any reliance" on the employee's reactions.

*Starbucks*, 140 F.4th at 976; *see also Dow Chem.*, 660 F.2d at 644; *Federal-Mogul Corp. v. NLRB*, 566 F.2d 1245, 1253 (5th Cir. 1978).

2.    Neri's PDC statements, considered in their full context, did not unlawfully threaten reprisal.   Start with the conversations' non-coercive context:  short, 10-20-minute meetings in the store's lobby, where partners were paid to participate.  ROA.25; ROA.34; ROA.47; RE5.  During those 10-20 minutes, Neri primarily gave performance feedback and discussed career development opportunities.  ROA.24; ROA.33-35; ROA.47; ROA.76; ROA.78; RE5.  Each meeting struck a positive tone:  Neri praised Ingram for her work, asked Cuellar-Serafini about becoming a shift supervisor, and discussed growth opportunities with Fonseca.  ROA.26; ROA.34-35; ROA.51-52.

Neri's decision to review Starbucks' benefits with Cuellar-Serafini and Fonseca is unremarkable and non-threatening.  ROA.35-36; ROA.48.  Benefits are one of the "usual topics" discussed during PDC meetings, as the ALJ recognized.   RE6.   Cuellar-Serafini and Fonseca both were new store partners.  ROA.31; ROA.45; RE6.  Neri testified that she discusses benefits in greater detail with newer partners to "make sure that they had an understanding of their benefits."  ROA.76.

Within this non-coercive backdrop, Neri told Cuellar-Serafini that Starbucks' current benefits "could not be guaranteed" if the store unionized. ROA.36. She likewise explained to Fonseca that "benefits would be put on the table, and potentially we could lose some of them, or, you know, who knows what the change would be if we were to unionize." ROA.51. Neri did not say that *Starbucks* would take benefits away or that Starbucks would do so *to punish union supporters. Cf. UNF W.*, 844 F.3d at 458 (statement that "the Company could reduce your wages" suggested the employer would unilaterally reduce wages in retaliation); *Bogart Sportswear*, 485 F.2d at 1205 (similar).

These statements accurately describe what happens during collective bargaining. Putting benefits "on the table" is just another way of describing the negotiation process. *See Lay on the Table*, Black's Law Dictionary (12th ed. 2024) ("To schedule for consideration."); *on the table*, Merriam-Webster Online Dictionary ("up for consideration or negotiation"). Indeed, unions use the phrase the same way. *See* Starbucks Workers United, *Updates from Bargaining!* (Apr. 2024), https://tinyurl.com/3n7c4pme ("[O]ver more than two years of fearless organizing, we brought Starbucks *to the table*." (emphasis added)). And by telling Cuellar-Serafini that "present benefits could be lost,"

Neri similarly explained "what could lawfully happen during the give and take of bargaining with the Union." *Flexsteel Indus., Inc.*, 311 NLRB 257, 257 (1993) (cited by the ALJ at RE7).

Speech that (as here) accurately describes the "natural give and take of the bargaining process" has long been protected under Section 8(c) and is not unlawful under Section 8(a)(1). *Hendrickson*, 932 F.3d at 472. Many courts of appeals and Board decisions protect speech just like Starbucks' speech in this case. For example:

- An employer stated: "IF our plant were to be unionized, and the collective bargaining process to begin, none of the benefits, compensation, or job security that you currently enjoy would be guaranteed. The Company and any recognized Union would begin the negotiating process from scratch. Which means all of the wages, benefits, and terms and conditions of employment that you currently enjoy at our plant would not be the starting point for negotiations toward a Union contract." *Hendrickson*, 932 F.3d at 472. The Sixth Circuit held that "the phrasing of the letter does not evince any intent on the part of company officials to adopt a regressive bargaining posture in response to unionization," and that "[t]he other facts of this case do not provide evidence of any … coercive environment" to support a Section 8(a)(1) violation. *Id.* at 473-74.

- A manager stated: "[I]f we were in the process of negotiating with the union, [then] all wages, benefits and working conditions" would "become a negotiable item." *NLRB v. Gen. Tel. Directory Co.*, 602 F.2d 912, 916 n.8 (9th Cir. 1979). He added, "in the course of negotiations, it's like starting with a blank piece of paper: each side tried to get certain benefits and things that they want into the contract and one side might give up one benefit to get something else that they wanted." *Id.* The Ninth Circuit held that those statements were "not only innocuous in

light of the circumstances, but well within the employer's 'protected speech' under § 8(c) of the Act." *Id.* at 916.

- An employer-employee letter stated: "[P]resent benefits could be lost," "[n]egotiations often go on for many months while your wages and benefits would be frozen by law," and "the Company could not unilaterally give a wage increase." *Flexsteel*, 311 NLRB at 257. The Board held that these statements "do not threaten employees with loss of benefits" because they merely explain "what could lawfully happen during the give and take of bargaining with the Union." *Id.*

- An employer stated: "Remember this, all these items become negotiable and put at risk at the bargaining table if you choose to be represented by a third party." *Venture Indus., Inc.*, 330 NLRB 1133, 1140 (2000). The Board held that "[t]here [was] no threat to decrease benefits" because while "the letter does not engage in an extended discussion of the collective-bargaining process, it correctly note[d] that, if the employees select the Union as their collective-bargaining representative, wages, overtime, and benefits become negotiable. The 'put at risk' remark is made in the context of the bargaining table." *Id.*

Further, no evidence suggests that any partner felt threatened by Neri's speech. *See Starbucks*, 140 F.4th at 976 (employee's reaction to allegedly threatening speech is relevant to whether speech is objectively coercive); *FDRLST*, 35 F.4th at 124 (same); *Federal-Mogul Corp.*, 566 F.2d at 1253 (same); *see also supra* pp. 9-11. To the contrary, Cuellar-Serafini started wearing her union pin after her PDC meeting. *See* ROA.33; RE5.

3.    The ALJ, whose reasoning the Board adopted, accused Starbucks of failing to offer evidence that Neri's speech was non-threatening. According to the ALJ, Neri's speech "predict[ed] changes in working conditions or

benefits," so Starbucks bore the burden of proving that those "statements were based on fact and not threats." RE7-8.

That is doubly wrong. First, Starbucks had no obligation to prove that Neri's speech was based on fact. The General Counsel "carries the burden of proving the elements of an unfair labor practice." *NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 401 (1983). In every Section 8(a)(1) case involving an employer's speech, the General Counsel must "demonstrate 'that section 8(c) does not protect an employer's predictions of the consequences of unionization.'" *DTR Indus., Inc. v. NLRB*, 39 F.3d 106, 114 (6th Cir. 1994) (quoting *Pentre Elec.*, 998 F.2d at 371). If anything, Section 8(c)'s protections amplify the General Counsel's burden. *See FDRLST*, 35 F.4th at 126 (courts "must construe the Act narrowly when applied to pure speech").

By forcing Starbucks to prove that Section 8(c) protected Neri's speech, rather than requiring the General Counsel to prove that her speech was unlawful under Section 8(a)(1), the ALJ flipped the NLRA on its head. That misreading of the Act suffices on its own to deny enforcement. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024) (when interpreting statutes, "if it is not the best, it is not permissible"); *Starbucks*, 140 F.4th at

976 (vacating Board's decision because it "erred by adopting the ALJ's application of an improper legal standard").

Second, Neri's statements are readily distinguishable from the kinds of "prediction[s] as to the precise effects" of unionization that the Supreme Court explained in *Gissel* "must be carefully phrased on the basis of objective fact." 395 U.S. at 618-19.  For example, a supervisor's prediction that a plant "would close if the union succeeded"—an action within the employer's control and distinct from the collective bargaining process—is a "precise effect" that must be supported by objective evidence that unionization would force the plant to close. *Bogart Sportswear*, 485 F.2d at 1205.  Otherwise, employees might interpret the plant closure "prediction" as a threat that the employer would choose to close the plant to punish employees for unionizing. *See id.*

But calling Neri's PDC statements a "prediction"—let alone one about unionization's "precise effects" that reasonably threatens reprisal—is a stretch. *See S. Bakeries, LLC v. NLRB*, 871 F.3d 811, 832-33 (8th Cir. 2017) (Gruender, J., concurring in part and dissenting in part) (*Gissel*'s "'carefully phrased' requirement applies only to an employer's statements that 'make a prediction as to the *precise effects* he believes unionization will have on his company'" (quoting *Gissel*, 395 U.S. at 618 and citing cases)).  Neri did not

32

*predict* whether benefits would change.  She did not predict anything.  She simply observed that collective bargaining puts benefits on the bargaining table, where they cannot be guaranteed in their current form.  It is hard to imagine what additional facts Neri could have presented to support these objectively true statements.

4.     The ALJ also attacked Neri for failing to explain that "benefits could also go up."  RE8.  But Section 8(c) allows employers to advocate against unions; employers need not maintain neutrality, discussing both the pros and cons of unions.  Section 8(c) also protects an employer's right "not to speak." *Nat'l Ass'n of Mfrs. v. NLRB*, 717 F.3d 947, 959 (D.C. Cir. 2013), *overruled in part on other grounds by Am. Meat Inst. v. USDA*, 760 F.3d 18, 22-23 (D.C. Cir. 2014) (en banc).  "This is why … a company official giving a noncoercive speech to employees describing the disadvantages of unionization does not commit an unfair labor practice if, in his speech, the official neglects to mention the advantages of having a union." *Id.*

In any event, managers do not need to speak with the "rhetoric … of a Federal Reserve Board chairman" for Section 8(c) to protect their speech. *Crown Cork*, 36 F.3d at 1140; *see also Exxon Rsch. & Eng'g Co. v. NLRB*, 89 F.3d 228, 233 (5th Cir. 1996) ("There are no magical phrases the mere

33

incantation of which are coercive and therefore violate § 8(a)(1).").  As long as Neri's statements—considered in context—did not reasonably imply that Starbucks would retaliate against union supporters by unilaterally slashing benefits, they are protected under Section 8(c).  *UNF W.*, 844 F.3d 458.  Neri's speech easily satisfied this standard.

None of the case law cited by the ALJ holds otherwise.  In *Webco Industries, Inc.*, 327 NLRB 172, 172 n.4 (1998), for example, the Board affirmed the ALJ's conclusion that a supervisor unlawfully threatened reprisal by telling employees that collective bargaining "negotiations would start from 'ground zero.'"  The supervisor explained that "ground zero" means "you have nothing, you lose everything," and "you have to negotiate for … all the benefits that you have."  *Id.* at 180 (cleaned up).  "*In context*," the Board explained, these supervisors' statements would cause employees to "reasonably believe that they would lose everything."  *Id.* at 172 n.4 (emphasis added).

Likewise, in *Plastronics, Inc.*, 233 NLRB 155, 156 (1977), the Board held that statements that collective bargaining "begins from scratch" or "starts at zero" "may or may not be" unlawful threats of reprisal, depending on context. *See also TRW-United Greenfield Div. v. NLRB*, 637 F.2d 410, 420 (5th Cir. 1981) ("If the clearly articulated thrust of the bargaining-from-scratch

statement is that the mere designation of a union will not automatically secure increases in wages and benefits, and that all such items are subject to bargaining, no coercion will be found." (cleaned up)).    The supervisor threatened employees in *Plastronics* by proclaiming that "if the Union 'got in,' the employees would lose benefits," "wages would be $2.30 per hour," and "negotiations would start from zero." 233 NLRB at 155-56.

Neri, however, never said that benefits would start at "ground zero" or "from scratch"; she accurately explained that they are "put on the table" during bargaining and cannot "be guaranteed." ROA.36; ROA.51. She did not suggest "that the company was threatening to adopt a regressive bargaining posture." *Hendrickson*, 932 F.3d at 473.

For all these reasons, the Board erred in concluding that Neri's PDC statements were unlawful threats of reprisal.

## B.    Jacobs' and Neri's Comments About the Hiring Portal and Store Hours Did Not Threaten Reprisal

The Board also adopted wholesale the ALJ's conclusions that Starbucks made unlawful threats when it told "employees that it had closed the store's hiring function because of the employees' union or other protected activities, and [told] employees that it had reduced the store's operating hours because of the employees' union or other protected activities." RE3; RE8. To be clear,

35

the General Counsel did not allege, and the ALJ did not find, that Starbucks actually closed the hiring portal or reduced the store's hours because of employees' union activity. *See* ROA.80 (General Counsel noting that it was not alleging "that store hours were changed because of union activity"); RE8 (ALJ noting that it was "irrelevant" "[t]hat the evidence failed to provide that either adverse action was due to union activity"). Instead, the ALJ's conclusions rested on only (alleged) comments by Starbucks managers to this effect. Both conclusions lack substantial evidence.

When the Court applies substantial-evidence review, it "uphold[s] the Board's factual findings only if they are supported by evidence that is substantial when viewed in light of the record as a whole." *AllService*, 138 F.4th at 900. "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Apple Inc. v. NLRB*, --- F.4th ---, 2025 WL 1862823, at *6 (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)). Here, "the record considered as a whole" does not contain substantial evidence that Jacobs or Neri made unlawful threats when they spoke about the hiring portal and store hours. *Carey Salt Co. v. NLRB*, 736 F.3d 405, 409-10 (5th Cir. 2013) (quoting 29 U.S.C. § 160(e)).

1.    *Hiring Portal.* The ALJ's finding that Jacobs told "employees" the store's hiring portal was closed because of the partners' protected activities is based on a single phone[3] call that Fonseca claimed he had with Jacobs. The entire record, which the ALJ and Board improperly ignored, contradicts that testimony. Regardless, even accepting the testimony, the record contains no substantial evidence that Jacobs' supposed comment threatened reprisal.

According to Fonseca, he and some Starbucks customers could not find the store's hiring portal, so Fonseca called Jacobs to report the issue. ROA.54-55. Jacobs supposedly replied that the portal had been "closed because of the unionization efforts," as Starbucks "couldn't talk about them during the hiring process." ROA.55. According to Fonseca, Jacobs explained that because management could not discuss unionization with applicants, they "didn't feel comfortable hiring new people on without talking to them about the Union." ROA.55. When Fonseca pointed out that the store was "understaffed" and

---

[3] The ALJ found that Fonseca "spoke to Jacobs in the back of the store," perhaps to suggest that this setting was more coercive. RE6. But Fonseca testified that he spoke with Jacobs "over the phone in the back of" the store. ROA.55. The ALJ simply got the facts wrong.

"needed more people," Jacobs allegedly "said that the people that we had didn't want to work and weren't covering shifts." ROA.55-56.

Fonseca's testimony about this single phone call is insufficient to permit this Court "to conscientiously conclude that the evidence supporting the Board's determination is substantial." *Brown & Root*, 333 F.3d at 633 (citation omitted). For starters, the Board and ALJ ignored or mischaracterized the evidence suggesting the hiring portal was actually open during spring and summer 2022. Neri, for example, testified that the store did not change its hiring practices because of union activity. ROA.84-85. The ALJ also ignored the unrebutted evidence that the store was actively interviewing people in spring and summer 2022. ROA.85-86. And the ALJ expressly found—based on "Fonseca's credible and undisputed testimony"—that store partners "are hired after submitting applications directly to a specific store through [Starbucks'] Taleo online portal and being interviewed by store management." RE5. If the hiring portal was closed, the interviews could not have occurred.

The Amidon store's summer 2022 staffing shortages further bolster Neri's testimony that the store was interviewing applicants in summer 2022. Fonseca himself testified that the store was so short-staffed that it kept closing early. ROA.63. He also agreed that the staffing shortages were not union-

related; they were caused by partners calling out because "they were sick, or some incident happened."  ROA.63-64.

The ALJ "fail[ed] to grapple with [these] countervailing portions of the record."  *AllService*, 138 F.4th at 901 (citation omitted).  The ALJ tossed aside Neri's testimony that management was interviewing in spring and summer 2022 because Neri "did not refute Fonseca's testimony that the hiring portal" was closed when Fonseca spoke with Jacobs.  RE6.  But Neri's testimony that the store was interviewing people directly refutes Fonseca's testimony that the portal was closed, because management interviews people *who have applied through the portal*.  RE5.

In any event, even if Fonseca's testimony about his conversation with Jacobs is accurate, it does not provide substantial evidence that Jacobs threatened reprisal.  At most, Jacobs' alleged comment suggests that Starbucks briefly paused hiring because management was hesitant to discuss ongoing protected activities with new *applicants*.  It does not follow that current *partners* would have felt that Starbucks was retaliating against them.  Rather, Neri changed the store's hours to help relieve partners crushed by staffing shortages.  None of this implies that Starbucks was punishing

partners for participating in protected activities; it suggests that management was proactively addressing a staffing shortage.

Moreover, nothing in the record suggests that Fonseca was intimidated, coerced, or threatened by either conversation. *See Starbucks*, 140 F.4th at 976 (courts "weigh[] employees' subjective impressions to determine how a reasonable employee would objectively view her employer's conduct"); *FDRLST*, 35 F.4th at 125 ("[E]mployees' subjective responses can be relevant to determining whether a reasonable employee—who is familiar with her employer and the context of a remark—would tend to be coerced."); *accord NLRB v. Windemuller Elec., Inc.*, 34 F.3d 384, 393 (6th Cir. 1994) ("The silence of the record [on this front] is significant."). Fonseca reached out to Jacobs to discuss the hiring portal, and after that conversation, he reached out to Neri to discuss the store hours change. ROA.55-57. He never testified that he felt coerced or threatened by Jacobs' or Neri's comments.

The ALJ also erred in reasoning that simply "linking the closing of the hiring portal … to Section 7 activity" suffices to "violate[] Section 8(a)(1)." RE8. Only employer speech that threatens "reprisal" is unlawful under the NLRA. 29 U.S.C. § 158(c). Unless Starbucks' speech "linking" the hiring portal to unionization "tend[s] to be coercive," it cannot violate the Act. *Renew*

*Home Health v. NLRB*, 95 F.4th 231, 242 (5th Cir. 2024) (quoting *Brown & Root*, 333 F.3d at 634).

2.   *Store Hours*.  For similar reasons, substantial evidence does not support the ALJ's conclusion that Starbucks violated Section 8(a)(1) by telling partners that Starbucks had "reduced store hours because they engaged in union activity." RE8. To start, Neri never actually said that the hours were reduced because partners were participating "in union activity." RE8. According to Fonseca, Neri just generically told him the hours were changed "because of the Union, and … to relieve some of the pressure that the Union had on the people." ROA.57.

Further, the ALJ reached his conclusion only after he "credit[ed] Fonseca's detailed testimony over Neri's terse denial regarding her statement that the shortened hours were due to union activity." RE7. That too was error. Where, as here, the ALJ's credibility findings amount to "an almost uniform discrediting of company witnesses and crediting of Board witnesses, in some circumstances when even the cold record militates for the opposite result," this Court has "the power to resolve questions of credibility against the choices made by the ALJ." *NLRB v. Centeno Super Markets, Inc.*, 555 F.2d 442, 443-44 (5th Cir. 1977) (Gee, J., concurring in part and dissenting in

part) (citing cases). "[S]uch a pattern of consistent credibility decisions at least justifies a closer scrutiny of the record." *Id.* at 444.

The Court should carefully scrutinize the ALJ's one-sided credibility findings. *See* RE4-9. The ALJ ignored testimony from Starbucks' witness (Neri) and the General Counsel's witnesses that supported Neri's explanation that the store's hours were reduced because of staffing shortages, not to retaliate against union-supporting partners. Neri explained in detail that the store could not operate without at least one supervisor on duty. ROA.79-80. She also testified that partners could work a maximum of eight hours per day. ROA.80. If the store was open for only 16 hours per day, then Neri could "schedule two supervisors for the whole day." *See* ROA.80. By changing the store's hours in summer 2022 to a 16-hour day, Neri did not need to schedule as many partners per day. Slightly reducing the store's hours to resolve staffing shortages made eminent sense given the shortages that both Neri and Fonseca described in their testimony. *See supra* pp. 38-39.

Ignoring all this evidence, the ALJ instead zeroed in on Fonseca's testimony that Neri told him the hours were changed "to relieve some of the pressure that the Union had on the people." ROA.56-57. But unlike Neri, Fonseca never discussed how partners are staffed at the store or how the

hours change would relieve staffing shortages, even though Fonseca himself was a shift supervisor. ROA.45-46; ROA.56.

In any event, even if Fonseca's account of the conversation was accurate, Neri's "linking" the hours change to the union, RE8, did not threaten reprisal. According to Fonseca, Neri communicated that she was trying to "relieve some of the pressure" on her partners. ROA.57. That is not the same thing as linking the hours change to *protected activities*. And Fonseca himself had complained that the store was understaffed. ROA.55-56. There was no evidence that any individual partner lost hours because of the hours change. Given the staffing shortages, it is unclear that partners would have viewed Neri's comment about the hours change as threatening reprisal rather than helping employees. Notably, Fonseca did not testify that he was intimidated, coerced, or threatened. *See Starbucks*, 140 F.4th at 976; *FDRLST*, 35 F.4th at 125; *Windemuller*, 34 F.3d at 393.

None of Starbucks' speech threatened reprisal, and the Board erred in concluding to the contrary.

## II. STARBUCKS DID NOT CREATE AN UNLAWFUL IMPRESSION OF SURVEILLANCE

The Board also held that Neri's discussion of unionization during the PDC meetings created an unlawful impression of surveillance. Specifically,

the Board faulted Neri's PDC statement to Cuellar-Serafini that "there was talk going around" the Amidon store about unionizing, as well as her statement to Ingram that voting in favor of unionizing "affects everyone." RE2; RE7. But the Board never considered whether Neri's speech created a *coercive* impression of surveillance, as the NLRA requires. Generic comments regarding "talk" about unionization do not even suggest any surveillance—let alone coercive surveillance. If an employer cannot begin a conversation about unionization with anodyne comments like these, the conversations will never take place. Under the correct standard, Neri's speech did not create a coercive impression of surveillance. The Court should deny enforcement.

1.    The NLRA does not prohibit an employer from surveilling its employees. Rather, "[t]he only surveillance, or impression of surveillance, which the Act prohibits is that which tends to interfere with, restrain, or coerce Union activities." *NLRB v. Mueller Brass Co.*, 509 F.2d 704, 708 (5th Cir. 1975); *accord Intertape Polymer Corp. v. NLRB*, 801 F.3d 224, 239 (4th Cir. 2015) ("[T]he Act requires conduct that could have reasonably been construed in the totality of the circumstances as coercive, intimidating, or threatening in nature."); *Belcher Towing Co. v. NLRB*, 726 F.2d 705, 708 (11th Cir. 1984) ("[A]bsent a tendency to coerce, surveillance or creating the impression of

surveillance does not constitute a § 8(a)(1) violation." (citing *NLRB v. Computed Time Corp.*, 587 F.2d 790, 794 (5th Cir. 1979)). To violate Section 8(a)(1), an employer's speech must imply "excessive or coercive surveillance, such that it unreasonably chills the exercise of the employees' Section 7 rights." *Intertape Polymer*, 801 F.3d at 236 (cleaned up).

"In recent cases involving employer surveillance of union activities, the Board has seemed to ignore this critical coercion element." *Greater Omaha Packing Co. v. NLRB*, 790 F.3d 816, 823 (8th Cir. 2015). The Board instead asks only "whether, under all of the relevant circumstances, reasonable employees would assume from the statement in question that their union or protected activities had been placed under surveillance." *Id.* Applying this artificially collapsed standard, the Board has held that an employer violates Section 8(a)(1) whenever it tells employees that "it is aware of their union activities, but fails to tell them the source of that information." *Id.* at 824. That bright-line test, however, does not assess coercion. *See id.*

The Board repeated this mistake here. It adopted the ALJ's reasoning, RE2, and with it, the ALJ's erroneous impression-of-surveillance test: "whether, under all the circumstances, the employer's statements or other conduct would lead reasonable employees to assume that the employer has

placed their union activities under surveillance," RE7 (quoting *Charter Commc'ns, LLC*, 366 NLRB No. 46, slip op. at 4 (Mar. 27, 2018)).  While the ALJ later articulated the test as whether, "under all circumstances, a respondent's remarks reasonably tended to restrain, coerce, or interfere with employees' rights," the ALJ never explained how Neri's words had any coercive impact. *See* RE7.  Nor did the Board. *See* RE2.  The Board majority's analysis does not even include the words "coerce" or "coercion." *See* RE1-4.

2.      Because the Board did not "explicitly find the requisite coercion," the Court should vacate the Board's impression-of-surveillance conclusion unless coercion is "apparent to the reviewing court from the record." *Greater Omaha*, 790 F.3d at 824.  It is not.  Neri's PDC statements did not "tend[] to interfere with, restrain, or coerce Union activities." *Mueller Brass*, 509 F.2d at 708.

a. Neri's generic statements were non-threatening conversation-starters, not speech that interfered with partners' union activities.  It is unclear how a comment that unionization "affects everyone" has anything to do with surveilling employees.  As for Neri's comment that she heard "talk" about unionizing, as Member Kaplan pointed out, "Neri's statements disclosed"—at most—"a general awareness of organizing activities."  RE2.

The ALJ recognized that "Neri's comments about union activity in Kansas City or the district alone did not reasonably convey the impression that employees' activities were under surveillance at the Amidon store." RE7. But if a reference to general organizing activity in the district would not coerce employees, then a reference to general organizing activity at a store that is part of that district would not either. In both cases, employees reasonably would assume that the manager heard chatter in the workplace.

Neri's statements also do not suggest that Starbucks was infiltrating union organizing activities or that management knew any specific details about unionization efforts. These factual deficiencies further undercut any suggestion that Neri's speech was coercive and distinguish this case from this Court's precedent. *Cf., e.g.*, *NLRB v. Dadco Fashions, Inc.*, 632 F.2d 493, 495-96 (5th Cir. 1980) (supervisor said he knew who had attended off-site union organization meetings and what had been said there, and supervisors attended and slowly drove by meetings), *abrogated on other grounds by NLRB v. USA Polymer Corp.*, 272 F.3d 289 (2001); *Delchamps, Inc. v. NLRB*, 585 F.2d 91, 93-94 (5th Cir. 1978) (supervisors said "that union organizing meetings were being monitored by management and that a company 'spy' had attended the meetings"); *NLRB v. Borden Co.*, 392 F.2d 412, 414 & n.3 (5th Cir. 1968)

(multiple supervisor speeches identified who had signed union cards and also threatened economic reprisal).

Further, the context surrounding Neri's PDC statements was not coercive. As explained above, the meetings were brief, took place in the store's lobby, and were predominantly positive conversations about partners' performance. Contrary to the Board's conclusions, Neri made no accompanying unlawful threats of reprisal. *See supra* pp. 27-35.

In addition, "[n]oticeably absent from the record is any evidence from any witness indicating that [Neri's PDC statements] had a coercive impact or effect." *Computed Time*, 587 F.2d at 794. Again, none of the Amidon store partners testified that they felt threatened or coerced. They did not stop participating in union-related activities after the PDC meetings. Cuellar-Serafini started wearing her union pin in May 2022, *after* her meeting with Neri. ROA.33.

b. Instead of focusing on whether Neri's speech was coercive, the Board mentioned that union-related conversations had taken place only outside the Amidon store, that Neri's decision to discuss unionization was "out of the ordinary" for PDC meetings, and that Neri did not explain how she learned about the store's union-related activities. RE2; RE7. Even if these findings

properly characterized the record (they do not), they are not substantial evidence that Neri's speech was coercive.

*Conversations Outside the Amidon Store.*  According to the Board, "the employees at the Amidon store held their organizing discussions outside the workplace and did not engage in any open union activity when Manager Carmella Neri told employee Maia Cuellar-Serafini that she was aware of union organizing at the Amidon store."  RE2.  To support these findings, the Board latched onto a single sentence from Cuellar-Serafini's testimony:

> Q. And what type of activities did you -- union activities did you participate in?
>
> A. Having conversations with my co-workers outside of the workplace, about forming a union, and what the rights were.

ROA.32.    Although that sentence suggests that *some* union-related conversations took place outside the store, it does not follow that these discussions happened *only* outside the store.

Additional testimony from Ingram—whom the ALJ deemed credible, *see* RE6-8—suggests that partners were openly discussing unionization inside the store.  Ingram testified that she would speak "out there" (*i.e.*, out on the floor, as opposed to in the back of the store) with her fellow partners about unionization.    ROA.24.    As Member Kaplan recognized, this testimony

49

suggests that partners "were engaging in open union activity" inside the store before the union campaign was publicly announced in May 2022. RE2. And in a small store "staffed with approximately 25" partners, RE5, it makes sense for a store manager to be aware of general "talk going around," ROA.35. Neri's generalized statements reflect her limited knowledge, too: she did not bring up any specific union meetings or activities, and she did not discuss details like where meetings took place or what was discussed.

*Out of the Ordinary Speech.* Contrary to the Board's conclusion, "the Act requires more than mere 'out-of-the-ordinary'" speech to transform Neri's protected Section 8(c) statements into Section 8(a)(1) violations. *Intertape Polymer*, 801 F.3d at 239. Rather, the unusual circumstances must show that the speech is coercive. *Id.*; *see also Charter Commc'ns, Inc. v. NLRB*, 939 F.3d 798, 821 (6th Cir. 2019) (Nalbandian, J., concurring in part and in the judgment) (the out of the ordinary "test is not the most reliable way to determine whether an employer has engaged in unlawful surveillance" because unusual activity is not necessarily coercive). Here however, Neri's speech was neither out of the ordinary nor coercive.

For starters, "[t]he union campaign itself was 'out of the ordinary'"— that is why Neri was talking about it. *Intertape Polymer*, 801 F.3d at 240. The

store partners started discussing unionization in February 2022—less than two months before the April PDC meetings. ROA.32; RE5. The Kansas City union campaign also started around that time.[4] As the ALJ found, the Amidon store PDC meetings took place every six months, in the spring and fall. ROA.33; ROA.47; ROA.74; RE5. Because Neri could not have brought up unionization in a PDC meeting before April 2022, her decision to do so in April, after the union campaign began, "adds nothing to the coerciveness inquiry." *Intertape Polymer*, 801 F.3d at 240. Under the Board's approach, "any otherwise lawful response" to out-of-the-ordinary union activity "would be [coercively] out of the ordinary, too." *Charter Commc'ns*, 939 F.3d at 821 (Nalbandian, J., concurring).

In any event, discussing unionization during the April 2022 PDC meetings would not have been out of the ordinary—let alone coercive—to Ingram, Cuellar-Serafini, or Fonseca. The April 2022 meetings were the first or second PDC meetings Neri ever had with these partners. Ingram joined the store in September 2021, Cuellar-Serafini in November 2021, and Fonseca

---

[4] *See* Jacob Martin, *Starbucks Employees Announce Plans to Unionize Two Kansas City-Area Locations*, KCUR (Jan. 31, 2022), https://tinyurl.com/3ww8mcvn (January 2022 Kansas City announcements).

in late April 2022.  ROA.22; ROA.31; ROA.45; RE6.  Without a baseline for what PDC meetings typically cover, none of these employees could have been under the impression that discussing unionization was out of the ordinary, let alone coercive.

As Member Kaplan pointed out, the Board and ALJ did not identify a single authority "holding that an otherwise lawful statement can create an unlawful impression of surveillance simply because it was made at a meeting with an employee that typically covers other topics." RE3.  We have not found one either.  That is unsurprising:  if discussing unionization for the first time is per se evidence of unfair labor practices, then employers would risk the Board's wrath every time they bring up unionization.  Punishing employers for trying to talk to employees about union-related developments would chill the "uninhibited, robust, and wide-open debate" that the First Amendment (and NLRA) promotes and protects.  *Chamber of Com. v. Brown*, 554 U.S. 60, 68 (2008).

*Neri's Alleged Failure to Explain Herself.*  Finally, the Board faulted Neri for failing to "explain the basis of her knowledge." RE2.  But again, Neri did not need to speak with the "rhetoric … of a Federal Reserve Board chairman" to receive protection under the First Amendment and Section 8(c).

*Crown Cork*, 36 F.3d at 1140. Rather, the General Counsel had to show that under the totality of the circumstances, Neri's statements coercively implied that she was surveilling her partners. They did not.

*Promedica Health Systems, Inc.*, 343 NLRB 1351, 1352 (2004), cited by the ALJ (at RE7), does not conclude otherwise. There, a supervisor's evasiveness in response to an employee's question implied that the supervisor had obtained union-related information "by stealth and unlawful means." *Id.* (citation omitted). Neri was never evasive. No evidence shows that she avoided a single partner's question.

*      *      *

As the ALJ recognized, and the Board did not dispute, "employers have the right to discuss unions during meetings that take place in the workplace and when employees are being paid." RE7. The Board's decision to hold that Starbucks' protected speech was an unfair labor practice "reveal[s] just how far it strayed from its statutory mandate." *Stern Produce Co. v. NLRB*, 97 F.4th 1, 10 (D.C. Cir. 2024). Instead of following Section 8(c)'s command that only a "threat of reprisal or force or promise of benefit" can violate the NLRA, 29 U.S.C. § 158(c), the Board now deems an employer's protected speech unlawful wherever a supervisor brings up unionization for the first time. That

holding stretches the NLRA to the "limits of its logic" and upsets the careful balance struck between Sections 8(a)(1) and 8(c). *Stern*, 97 F.4th at 11 (quoting *NLRB v. Int'l Bhd. of Elec. Workers, Loc. 340*, 481 U.S. 573, 597 (1987) (Scalia, J., concurring)).

## CONCLUSION

This Court should set aside the NLRB's order and deny the NLRB's application for enforcement.

Dated: July 16, 2025                    Respectfully submitted,

JEFFREY S. HILLER                        */s/ Lisa S. Blatt*
LITTLER MENDELSON, P.C.                   LISA S. BLATT
  *41 S. High St., Ste. 3250*            *Counsel of Record*
  *Columbus, OH 43215*               AMY MASON SAHARIA
                                         CLAIRE R. CAHILL
JONATHAN O. LEVINE                       ERIC J. TUCKER
LITTLER MENDELSON, P.C.                   WILLIAMS & CONNOLLY LLP
  *1111 E. Kilbourn Ave., Ste. 1000*     *680 Maine Avenue, S.W.*
  *Milwaukee, WI 53202*                *Washington, DC 20024*
                                           *(202) 434-5000*
                                           *lblatt@wc.com*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 16, 2025, I electronically filed the foregoing document with the United States Court of Appeals for the Fifth Circuit by using the appellate NextGen system. I certify that all participants in the case are registered NextGen users and that service will be accomplished by the appellate NextGen system.

Dated: July 16, 2025                    /s/ *Lisa S. Blatt*
                                        LISA S. BLATT

## CERTIFICATE OF COMPLIANCE

I certify, pursuant to Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure, that the attached Brief of Petitioner/Cross-Respondent contains 10,949 words and complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Word 2019, in 14-point CenturyExpd BT.

Dated:  July 16, 2025                                    /s/ *Lisa S. Blatt*
                                                                         LISA S. BLATT